```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3
   SALVATORE ZICCARELLI,            )
 4                                  )
                    Plaintiff,      )
 5                                  )
                                    )
 6   -vs-                           )  Case No. 17 C 03179
                                    )
 7                                  )  Chicago, Illinois
     THOMAS J. DART, Sheriff of     )  March 8, 2024
 8   Cook County, Illinois,         )  10:02 a.m.
                                    )
 9                   Defendant.     )

10
            TRANSCRIPT OF PROCEEDINGS - Pretrial Conference
11      BEFORE THE HONORABLE JOHN J. THARP, JR., and a Jury

12
     APPEARANCES:
13
     For the Plaintiff:      KENNETH N. FLAXMAN, P.C.
14                           MR. KENNETH N. FLAXMAN
                             MR. JOEL A. FLAXMAN
15                           200 South Michigan Avenue
                             Suite 201
16                           Chicago, IL 60604

17   For the Defendant:      COOK COUNTY STATE'S ATTORNEY'S OFFICE
                             MS. KATHLEEN C. ORI
18                           MS. NAZIA HASAN
                             500 Richard J. Daley Center
19                           Chicago, IL 60602

20

21

22   Court Reporter:         KELLY M. FITZGERALD, CSR, RMR, CRR
                             Official Court Reporter
23                           United States District Court
                             219 South Dearborn Street, Room 2304A
24                           Chicago, Illinois  60604
                             Telephone:  (312) 818-6626
25                           kmftranscripts@gmail.com
```

1     (Proceedings heard in open court:)

2          THE COURT:  Okay.  Good morning.  Counsel want to put

3     your appearances on the record?

4          MR. K. FLAXMAN:  Good morning, Your Honor.  Kenneth

5     Flaxman and Joel Flaxman for the plaintiff.

6          THE COURT:  Good morning.

7          MS. ORI:  Good morning.  Kathleen Ori for the

8     plaintiffs.

9          MS. HASAN:  Good morning.  Nazia Hasan on behalf of

10    defendants.

11         THE COURT:  Good morning.

12         All right.  We sent you I think on Wednesday a set of

13    proposed jury instructions, Version 1, Court's proposed jury

14    instructions, Version 1, and the *voir dire* questionnaire.

15         Let me start with the *voir dire* questionnaire.  As I

16    think you were advised, several of the questions that were

17    proposed by the parties in their agreed *voir dire* are

18    questions that I pose to the group as a whole when they

19    assemble in the courtroom, things like do you speak English

20    and I forget what the other one was that you had included.  So

21    that's why those are not included in this set.

22         Understanding that, I think we captured what the

23    parties were seeking to address in their proposed *voir dire*,

24    but if anyone has any issues about what we sent out, I will

25    hear them.

1       MR. K. FLAXMAN:  We have no issues with your

2   questionnaire, Your Honor.

3       THE COURT:  All right.

4       MS. ORI:  Just two small things.  Question number 19

5   where it says, "Would you have any objection or hesitation in

6   awarding substantial money?"  The word "substantial,"

7   depending on where you come out on damages, I think the word

8   "substantial" is not necessary.

9       THE COURT:  Mr. Flaxman?

10       MR. K. FLAXMAN:  I don't think there's much of a

11   point of asking that question without "substantial."  We want

12   to know how they feel about giving money to a plaintiff,

13   whether they're fixed with saying people who sue shouldn't get

14   any money or whether they just -- I don't think you're telling

15   them that they're going to be substantial, but just inquiring

16   of them about their predisposition about awarding substantial

17   damages.

18       THE COURT:  I agree with plaintiff here.  The

19   question ends with the phrase "if the damages are supported by

20   evidence and law."  The point is to make sure that someone

21   doesn't have a blanket aversion to awarding substantial

22   damages, whatever that may be in their minds.  So the

23   objection to 19 is overruled.

24       MS. ORI:  And then in 20, just defendants, I think we

25   want to make it defendant just because we're not talking about

4

1    Cook County.

2            MR. K. FLAXMAN:  No objection.

3            THE COURT:  Yeah.  Thank you.  Okay.  We'll clean

4    that up.

5            Anything else on the questionnaire?

6            MR. K. FLAXMAN:  Not from plaintiff.

7            MS. ORI:  That's all we had.

8            THE COURT:  Okay.  While we're talking about *voir*

9    *dire*, let me just explain the process that we'll use for that.

10           When the jurors report to the jury room on the second

11   floor, they'll be given the questionnaire with that cover

12   letter, and they will complete the questionnaire, either there

13   in the jury room or sometimes they're taken to an empty

14   courtroom to do that.

15           Once we have the completed questionnaires, they'll be

16   copied for you, and you'll be given the questionnaires.  The

17   juror -- Juror No. 1 will match up with questionnaire No. 1

18   and so forth.  We should have about 24 potential jurors.  You

19   will have a list of, you know, 1 through 24, however many

20   there are jurors, and then you'll have copies of the

21   questionnaires in the same -- identified by juror number so

22   you'll be able to match up on the list you're given and the

23   questionnaire who goes to what.

24           I won't necessarily follow up with every juror.  It

25   just depends on the nature of their responses.  If I do -- I

1    mean, usually we have some followup for most of the jurors.

2    They'll be called up to the witness stand, and we'll do them

3    individually and do the followup that I think is necessary.  I

4    don't know if everybody -- is everybody familiar with the

5    white noise sidebar system that we're using now?  Okay.  So if

6    there's something that a potential juror doesn't want to

7    discuss, you know, in front of everyone in the courtroom, we

8    have the ability to go to sidebar on the headphones to cover

9    those questions.

10           At some point before you exercise challenges for

11   cause, you'll have the opportunity if you think there's some

12   additional followup necessary as to one or more of the jurors,

13   at some point when it's convenient to do so over the course of

14   the morning, I'll give you that opportunity to raise any

15   additional followup questions that you may want me to pose,

16   and to the extent I agree to do that, we'll do those

17   followups.

18           Then we'll have challenges for cause.  I'll rule on

19   those, and so you'll know how many challenges for cause have

20   been granted when you exercise your peremptory challenges, the

21   point being, again, we're going to have a jury of eight

22   people.  Each side gets three peremptory challenges.  So at

23   most, if you know how many challenges for cause have been

24   granted, we'll use, again, two for the example.  If two

25   challenges for cause have been granted, six peremptory

1    challenges have been exercised and there's eight jurors, that

2    accounts for 16 jurors right there.  Juror No. 17 under that

3    scenario, 17 and higher, cannot possibly be among the 16

4    lowest numbered -- or eight lowest-numbered jurors who have

5    not been subject to a challenge, a sustained challenge.  So

6    don't waste your peremptories in this example on 17 and above

7    because they'll never be one of the eight lowest unstruck

8    jurors.  Now, again, the math depends on the number of

9    challenges for cause.  But if you add up the challenges for

10   cause, the six peremptory challenges and the eight jurors,

11   that will give you the number that you don't want to exceed in

12   exercising your peremptory challenges.

13           Everybody follow that?

14           MR. K. FLAXMAN:  We do, Your Honor.

15           MS. ORI:  Just one question.  We're going to go

16   through the for cause objections before we submit our

17   peremptory objections?

18           THE COURT:  Yes.

19           MS. ORI:  Okay.

20           THE COURT:  So you'll know how many of those have

21   been granted.

22           Okay.  Any other questions about the jury selection

23   process?

24           MR. K. FLAXMAN:  None from plaintiff, Your Honor.

25           MS. ORI:  No.

1          THE COURT:  Okay.  Then let's take a look at the

2     proposed jury instructions.  What I propose to do is just walk

3     through this page by page, and if anybody has noted anything

4     at this point in terms of, you know, ranging from typo

5     corrections to substantive issues you can raise it.  Most of

6     the wordsmithing that we did in the general instructions I did

7     not redline because it's not intended anyway to have any

8     substantive effect.  But if you have any problems with the

9     wording as I've used it in those general kinds of

10    instructions, by all means let me know about it and I will

11    consider your objection.

12          Toward the end where we're talking about the

13    substantive instructions, I left in redlining to identify

14    either decisions that I've made or issues that I thought we

15    should talk about.  And we'll obviously get to those as we go

16    through the instructions.

17          Don't worry about the table of contents just yet.

18    That will change as the instructions are revised, and that's

19    done automatically.

20          So looking at what is marked on my copy of that file

21    that we sent you as page 3, starting with "Members of the

22    jury," anybody have any issues on that page?

23          MR. K. FLAXMAN:  None from plaintiff.

24          MS. HASAN:  No.

25          THE COURT:  All right.  And I'm not sure if we

1    indicated this when we sent these out, the bracketed material

2    is dependent on obviously what happens at trial and whether

3    that will be necessary or not.

4          All right.  Page 4, "What Evidence Is and Is Not."

5    Any issues there at this point?

6          MR. K. FLAXMAN:  None from plaintiff.

7          MS. ORI:  No.

8          THE COURT:  All right.  That spills over into page 5.

9    I assume nothing there.  So let's go to page 6, starts with

10   the heading "Weighing the Evidence."

11         Any issues there?

12         MR. K. FLAXMAN:  Well, there are going to be so few

13   witnesses in this case that I don't think the bracketed

14   material "do not make any decisions simply by counting the

15   number" could possibly be given.

16         THE COURT:  I would agree.

17         Do you have any issue with that?

18         MS. HASAN:  No.

19         THE COURT:  Okay.  So I think we can get rid of that

20   last instruction at the bottom of page 5 -- or page 6.

21         All right.  Page 7, "Assessing Witness Credibility."

22         MR. K. FLAXMAN:  There won't be any experts.

23         THE COURT:  All right.  So we don't need the expert

24   instruction.  That will come out.

25         Do we anticipate any examination about the fact that

1    somebody met with a lawyer?

2          MR. K. FLAXMAN:  Not at this time, but it's always

3    possible that will --

4          THE COURT:  All right.  We'll leave it in for now as

5    bracketed.  If there is no testimony to that effect, I think

6    it's probably appropriate to drop that, but we'll see what

7    transpires.

8          Prior Inconsistent Statements, any issues with that?

9    Obviously that entire section depends on how things go at

10   trial.  If we don't have any impeachment with inconsistent

11   statements, we won't need that instruction.

12         All Litigants Equal Before the Law, bottom of page 8.

13         MR. K. FLAXMAN:  I'm not sure what's added by "in his

14   official capacity."  It might be confusing.

15         THE COURT:  Well, what I've got in the case caption

16   is Ziccarelli v. Thomas J. Dart in his official capacity as

17   Sheriff of Cook County, Illinois.  And in my comments to the

18   jury, when they come in for *voir dire*, this is how I intend to

19   introduce the statement of the case:  "This case is entitled

20   Salvatore Ziccarelli v. Cook County Sheriff Thomas Dart in his

21   official capacity.  That just means that the suit isn't

22   against Sheriff Dart personally.  It's against the Sheriff's

23   Office.  This case involves a federal statute," blah, blah,

24   blah.  So that's where I was coming from with respect to that

25   instruction.

1          Do you have any problem with the substance of that?

2          MR. K. FLAXMAN:  I don't have any problem with the

3    substance.  I think it's confusing.  We're not talking -- all

4    litigants equal before the law, we don't mention the sheriff

5    by name, and we add -- or Your Honor adds "in his official

6    capacity."  But I don't know if that's -- how significant that

7    is.

8          THE COURT:  Ms. Hasan?

9          MS. HASAN:  Your Honor, this follows a pattern

10   instruction to ensure that government entities or corporations

11   are given equal credence just like an individual who is

12   testifying would be.  All of our witnesses are representatives

13   of the Sheriff's Office.

14         THE COURT:  All right.  I think it's appropriate to

15   give the instruction.  If there's -- and it's accurate to say

16   that the defendant is the Sheriff of Cook County in his

17   official capacity.  And I think that that is necessary to

18   explain to the jurors that they're not considering whether

19   Tom Dart is personally liable for these actions.  They're not

20   going to hear any testimony, I presume, that Sheriff Dart had

21   any conversations or information about this -- the events of

22   this case at all.  So I think that it's appropriate to advise

23   them that it's the Sheriff's Office, not Mr. Dart personally

24   who is responsible.

25         MR. K. FLAXMAN:  What if the instruction said, "The

1   defendant, the Office of the Sheriff of Cook County, is a

2   governmental entity"?

3           THE COURT:  I'm okay with that as long as we are okay

4   with changing the caption in the same fashion.

5           MR. K. FLAXMAN:  Plaintiff has no objection to taking

6   Mr. Dart out of the caption.

7           THE COURT:  All right.  Any problem there?

8           MS. HASAN:  Your Honor, the statute and the way that

9   the case was brought and all of the litigation associated with

10  Sheriff Dart is that he needs to be named in his official

11  capacity.  I haven't had a chance to discuss this with the

12  client, what their position is.

13          THE COURT:  All right.

14          MS. HASAN:  But it has been our position that Sheriff

15  Dart is always the proper defendant in a case in his official

16  capacity.

17          THE COURT:  All right.  We'll revisit that if you

18  want to talk to folks.  I don't think it's a huge issue either

19  way.

20          MR. K. FLAXMAN:  And could I ask that people speak

21  closer -- Your Honor is fine.  I can hear Your Honor, but I

22  can't hear defense counsel and that's my fault.  But we have

23  this great sound system.

24          THE COURT:  We do have a sound system that should

25  make sure everyone hears so please speak into the microphone.

1        Okay.  Burden of Proof on page 9.

2        MR. K. FLAXMAN:  Plaintiff has no objection.

3        MS. HASAN:  No objection.

4        THE COURT:  All right.  Nature of a Family Medical

5   Leave Act, my comment sort of looks like it goes to what I had

6   added but it really goes to what was deleted there.  The

7   statement, "The FMLA gives the employee the right following

8   FMLA leave to return to the position he held when leave began"

9   I don't think is exactly correct.  So that's why I deleted

10  that sentence at the beginning of the second paragraph.

11  Essentially this was an issue that we left open on our prior

12  pretrial conference.  I think it is appropriate to advise the

13  jury that an attempt to exercise FMLA leave is protected

14  activity and that trying -- that interfering or discouraging

15  an employee's effort is a violation of the statute.  So that's

16  what I'm intending there.

17        Any problems with what I've got?

18        MS. HASAN:  No.

19        MR. K. FLAXMAN:  We have no problems with the second

20  paragraph.  The first paragraph refers to Sheriff Tom Dart.

21  Probably that should be the Office of the Sheriff.

22        THE COURT:  All right.  Well, we'll see how we're

23  going to handle that.  It should be consistent with whatever

24  convention we use to identify the defendant.

25        All right.  Elements of an FMLA Interference Claim.

1   And basically what I have done here is simply add the "if you

2   find" paragraphs at the end of the elements instruction rather

3   than having them included in the definitional -- the

4   subsequent definitional instructions.

5           So any problem with the elements of an FMLA

6   interference claim?

7           MR. K. FLAXMAN:  Not from plaintiff.

8           MS. HASAN:  Your Honor, we had offered to stipulate

9   to elements 1 and 2.  Plaintiff declined that offer.

10          THE COURT:  Yeah.  Well --

11          MS. HASAN:  So I don't know if we need to -- we're

12  not contesting elements 1 and 2.

13          THE COURT:  All right.  So, Mr. Flaxman, what's your

14  view here?

15          MR. K. FLAXMAN:  Well, I think the facts relevant to

16  1 and 2 are important for context for the jury to understand

17  what this case is about.  It's going to be a very

18  incomprehensible scenario for the jury to be told that -- hear

19  testimony that Mr. Ziccarelli called up Mr. Shinnawi, they had

20  a disputed conversation, then Mr. Ziccarelli resigned.  I

21  think if the defendant said last time that they wanted to,

22  they were not conceding any of the elements, we prepared our

23  trial testimony and our theory on that basis, and we don't

24  think they should be allowed to change the case at the last

25  minute.

1          THE COURT:  Well, they're not changing the case.

2     This was an open item of discussion that wasn't fully

3     resolved.

4          In my mind it comes down to is there -- what is the

5     relevance of the specific serious health condition that

6     Mr. Ziccarelli had.  If it is a given -- -- this really

7     doesn't even turn on the first element being identified as

8     posttraumatic stress disorder.  I'm not sure I see the

9     relevance regardless of what the serious health condition is

10    in identifying the serious health condition as opposed to

11    simply saying, whether it's stipulated to or not, that the

12    plaintiff had a serious health condition.

13         MR. K. FLAXMAN:  Well, I think whether or not he had

14    a serious health condition which is correctly defined in the

15    next instruction about a health condition that makes him

16    unable to perform the functions of his position is important

17    for the jury to understand what was going on in the

18    conversation he had.

19         THE COURT:  Sure.  I don't disagree with that.  My

20    question is what's the relevance of whether his serious health

21    condition was posttraumatic stress disorder or cancer or --

22         MR. K. FLAXMAN:  Well, but I think it's important for

23    the jury to know that he was unable to perform the functions

24    of --

25         THE COURT:  Yeah.  That's going to stay in the

1  phrase: "'Serious health condition' means a health condition

2  that makes him unable to perform the functions of the

3  position." That's in. What I'm asking is why in the elements

4  instruction, why do we need as a first element evidence or

5  proof that the plaintiff had posttraumatic stress disorder,

6  and second, that the condition was a serious health condition.

7  It would seem to me that the specific health condition isn't

8  relevant. What is relevant is that he had a serious health

9  condition which is defined as a condition that makes him

10  unable to perform the functions of his position.

11         MR. K. FLAXMAN: Excuse me for one second.

12    (Counsel conferring.)

13         MR. K. FLAXMAN: Well, my co-counsel raises the

14  question about whether eliminating those first two elements

15  would eliminate the materiality or the admissibility of

16  testimony by Mr. Ziccarelli that he had posttraumatic stress

17  disorder from working at the jail and that he was -- wanted to

18  take eight weeks of leave and called up Ms. Shinnawi and said,

19  I want to take eight weeks of FMLA -- or additional FMLA

20  leave, and she said, If you take more time, you'll be fired.

21         THE COURT: Well, it just begs the question what's

22  the relevance of the specific condition?

23         MR. K. FLAXMAN: Well, it's --

24         THE COURT: Why is it any more relevant that

25  Mr. Ziccarelli had posttraumatic stress disorder than it is

1  that he had cancer that prevented him from performing the

2  functions of his job?

3          MR. K. FLAXMAN:  Well part of it goes to preserve the

4  record for Your Honor's ruling about subjective and objective.

5          THE COURT:  Well, to be consistent with the record,

6  it's an objective standard, so Mr. Ziccarelli's subjective

7  understanding or subjective mental condition isn't relevant to

8  the application of an objective standard.  So to be consistent

9  with the ruling, that would suggest not including that

10 evidence.

11          Hang on just a second.

12          Hang on.  We'll adjourn for just a moment.

13     (Off the record.)

14          THE COURT:  Okay.  Sorry.  Back on the record.

15          So we were discussing the relevance or lack of

16 relevance of the specific condition that was the subject of

17 Mr. Ziccarelli's FMLA inquiry.

18          MR. K. FLAXMAN:  It's important context for why

19 Mr. Ziccarelli made the phone call and why he should be

20 believed when he gives a different version of what was said in

21 that phone call than Ms. Shinnawi gives.  His credibility is

22 really what this case is about, his credibility versus

23 Ms. Shinnawi's testimony, credibility.  And to just sanitize

24 it and not let the jury know why he made that phone call

25 prevents the jury from assessing credibility.

1    I think there might also be -- I think there also is

2  an argument that the plaintiff is entitled to have the jury

3  decide each elements of the claim.  If the defendants want to

4  stand up in opening argument and say, Those are the four

5  elements, we're agreeing that he had posttraumatic stress

6  disorder, we're agreeing that it was a serious health

7  condition, this is about whether he had notice of his need for

8  leave and whether the defendants interfered with his right to

9  take leave, they're certainly entitled to do that.  But I

10  think we have to be able to tell the jury what was going on

11  when he made that phone call.

12    THE COURT:  All right.  I disagree.  I don't see any

13  relevance to the specific condition.  What is relevant is that

14  there was a serious health condition that prevented

15  Mr. Ziccarelli from performing the functions of his position.

16  Whether that health condition was PTSD or cancer or diabetes

17  or, you know, any number of other illnesses does not have any

18  bearing on whether -- as long as it qualifies as a serious

19  health condition, the precise diagnosis of that health

20  condition does not have any relevance to whether the defendant

21  violated the FMLA statute.

22    I don't think it goes to credibility.  I think what

23  you're trying to say with respect to credibility is it might

24  go to Mr. Ziccarelli's understanding of what transpired during

25  the course of that conversation with Ms. Shinnawi.  But that's

1    not credibility.  That is subjective understanding which, as

2    I've ruled, is not the appropriate standard.

3           If a subjective understanding is the appropriate

4    standard, then I've got it wrong, and we're going to

5    reassemble at some point and the Seventh Circuit will tell me

6    I'm wrong.  But for the reasons we've already discussed at

7    length on the record on the 28th, I don't see the subjective

8    standard being the applicable standard.

9           MR. K. FLAXMAN:  One additional argument is that if

10   the jury doesn't know anything about why Mr. Ziccarelli wants

11   to take more leave than he has, I think he had five weeks and

12   he wanted to take more than that, or three weeks and he wanted

13   to take more than that, they might think that he's not

14   serious -- not -- they might say, we need to know why he

15   wanted to take that much leave, why he needed to take more

16   leave than what he had.  And unless we know that, we're not

17   going to find for him because that's this mystery.  It's not

18   like he wanted to take one day of leave and it's fine, then he

19   has a serious health need that requires he be off for one day.

20   But without telling the jury he had a serious health condition

21   for which a doctor had told him to take eight weeks off from

22   work, cutting out elements 1 and 2, or not letting us

23   introduce evidence relevant to 1 and 2 is going to be make it

24   very hard for plaintiff to prevail.

25           THE COURT:  I don't have any problem with what you

1    just described in which you did not mention PTSD.  I think

2    that's fair testimony.

3         MR. K. FLAXMAN:  Well, he had a serious health

4    condition that -- for which a doctor had --

5         THE COURT:  Had previous -- had advised him he needed

6    to obtain treatment that would last eight weeks, or that would

7    require him to be off the job for eight weeks.

8         MR. K. FLAXMAN:  That's acceptable to the plaintiff,

9    Your Honor.

10        THE COURT:  All right.  I should ask you for your

11   view, but --

12        MS. HASAN:  Right.  We agree that if the diagnosis of

13   posttraumatic stress disorder is not at issue, it won't be

14   part of the testimony.  We have no objection to that.

15        THE COURT:  Okay.  And, again, and just for the

16   record, I don't think the conversation that you just described

17   would be hearsay.  It's not offered for the truth of the

18   matter that he really did need eight weeks, true or false, but

19   it's offered because those words, according to Mr. Ziccarelli,

20   were spoken, and that's what he was told.  So there's no

21   hearsay issue with respect to that testimony.  Okay.

22        All right.  So the elements of an FMLA interference

23   claim, the first and -- we'll end up with three rather than

24   four.  And the first and second will be merged, but we will

25   not be -- I mean, the first element will basically be,

1    Plaintiff had a serious health condition.  I will define

2    serious health condition for you in a moment.  Second,

3    defendants had appropriate notice; third, defendants

4    interfered with his right.  If you find, if on the other hand

5    you find, that's how that will go.

6          MR. K. FLAXMAN:  I was proposing that we include in

7    the instruction that he had a serious medical -- serious

8    health condition for which a doctor had told him to take eight

9    weeks off from work.

10         THE COURT:  I'm not going to put that in the

11   instruction, but it will be evidence that you can argue.  It's

12   not necessary proof of an element of the offense that a doctor

13   told him he would have to be off for eight weeks.  That's

14   relevant evidence as to why Mr. Ziccarelli was seeking FMLA

15   leave.

16         MR. K. FLAXMAN:  If I was a defense, I would argue,

17   well, where's the doctor, why haven't we heard from the doctor

18   to say he told that to Mr. Ziccarelli?  And we're not calling

19   the doctor because of Your Honor's ruling about objective and

20   subjective.

21         THE COURT:  Well, you could call the doctor for the

22   purpose of saying what did you tell Mr. Ziccarelli in terms of

23   how long he would have to be off work or how long he needed

24   treatment.

25         MR. K. FLAXMAN:  We might not be able to get the

1   doctor to appear in person on Monday or Tuesday given the

2   notice that we have now.  That was what our motion was to

3   allow him to testify by remote means.

4          THE COURT:  All right.  Well, we never got to I guess

5   that motion because it was indicated based on my rulings that

6   you weren't going to call him.  But I was prepared and will

7   not permit the doctor to be -- to testify remotely.  He's not

8   distantly out of town.  There's a strong preference for live

9   testimony, and it's not unusual for healthcare professionals

10  to be required to appear and testify.  So I'm not going to

11  conduct a video hearing for the doctor.

12         MR. K. FLAXMAN:  It's -- the only way I would get him

13  to appear Monday or Tuesday would be if the marshals went out

14  and arrested him which does not seem appropriate in this case.

15         THE COURT:  Well, I presume if you issue a trial

16  subpoena and he is not going to observe the trial -- I find it

17  hard to believe that he is not going to comply with a trial

18  subpoena at the risk of being found in contempt of court.

19         MR. K. FLAXMAN:  If I represented him, I would move

20  to quash the subpoena saying that's not enough notice, I have

21  patients booked up months in advance and I can't just cancel

22  them all.

23         THE COURT:  Well, this trial date has been set for

24  months.  And if it was -- it's always been your view and

25  anticipated that the doctor's testimony might be needed in

1   trial.  This issue should have been raised well in advance.

2       MR. K. FLAXMAN:  Well, it was raised, Your Honor, in

3   the motion requesting that he testify by video means, and Your

4   Honor didn't rule on that -- or that wasn't -- Your Honor

5   wasn't about to rule on that until we had the hearing I think

6   last week.  And I can't get -- he's not going to be able to

7   come Monday or Tuesday.  I'm not going to have the temerity to

8   insist that a psychiatrist who is working for poor people in

9   the city of Joliet take a day off to come up here to testify,

10  I don't remember anything about this but these are my records,

11  and if I wrote in those records that I told him to take eight

12  weeks -- do an eight-week outpatient program, that's what I

13  told him, but I have no recollection about anything else.  I

14  would not do that.  And I don't think Your Honor would do that

15  if you were representing the plaintiff in this case.

16      THE COURT:  Well, I think I would have advised my

17  potential witnesses of a trial date and sought a ruling -- if

18  there was a problem with them appearing, I would have sought a

19  ruling from the Court sooner than February 28th.

20      So to the extent you're looking for a ruling on your

21  motion *in limine* that he be allowed to testify remotely, that

22  will be denied.  You can -- there's presumably at a bare

23  minimum not going to be any contrary evidence presented by the

24  defendant as to what the doctor said to Mr. Ziccarelli with

25  respect to his need for treatment or the length of the

1    treatment that he needed, but perhaps you can work out a

2    stipulation that that is, in fact, what the doctor said.

3    Again, I expect counsel to not frivolously contest issues

4    where there's no good faith basis to do so, and I'll leave it

5    at that.

6            Okay.  Appropriate notice, element 3.  This was

7    another issue that we left open, not entirely resolved.

8            MR. K. FLAXMAN:  Oh, could we go back to the elements

9    of FMLA leave?  I think actually the pattern instructions,

10   when an element is not disputed, the element is recited to the

11   jury, and then there's a sentence, And this element is not

12   contested in this case.  And I think it would be appropriate

13   to do that in this instruction about the FMLA interference

14   claim.

15           THE COURT:  Well, we're going to -- we're going to

16   instruct the jury that the elements of an FMLA claim require

17   proof that the defendant -- or that the plaintiff had a

18   serious health condition that made him unable to perform the

19   functions of his position.  That's what the statute requires.

20   The statute doesn't require specific identification of the

21   diagnosis as an element of proof.  It requires proof that the

22   defendant suffered from a serious health condition, and that's

23   what we're doing.

24           MR. K. FLAXMAN:  But if an element is not contested,

25   I think the pattern language is to, This element is not

1   contested, and you should take it as having been established

2   in this case.

3            THE COURT:  I see no point in instructing the jury

4   about an element that is not disputed and is not -- as to

5   which there's going to be no presentation of evidence.

6            MR. K. FLAXMAN:  Well, there's another contested

7   third element.  I think the pattern 1983 instruction has

8   language that the instruction has that, or maybe at one time

9   it had that, doesn't have it now.  But I think that's what I'm

10  inspired by in this argument.

11           THE COURT:  All right.  Well, again, my controlling

12  philosophy on jury instructions is they should be as simple as

13  possible, consistent with the need to accurately inform the

14  jury of what the law is.  The law is that the FMLA applicant

15  has to have a serious health condition which is defined as one

16  that interferes or prevents him from performing the functions

17  of his position.  That's what the jury will be told the

18  plaintiff has to establish, and there's not going to be any

19  contrary evidence to that point.

20           MR. K. FLAXMAN:  But as I understand Your Honor's

21  ruling, he can't say -- Mr. Ziccarelli can't say, I had PTSD.

22           THE COURT:  Right.  What's -- unless you can tell me

23  what the relevance is.

24           MR. K. FLAXMAN:  That's what's on the form which the

25  jury -- if we get to -- the evidence on notice is going to

1    include the document that he was given when he was granted

2    FMLA leave which talks about what kind of notice he has to

3    give to take FMLA leave which talks about his diagnosis and

4    his conditions, I believe.  And if he can't testify -- I mean,

5    if he can't testify, I had PTSD, but it's in the form, it will

6    be confusing.

7            THE COURT:  What's the exhibit?

8            MR. K. FLAXMAN:  It's defense -- Joint Exhibit 4.

9    The last page of -- it's FMLA -- the Bates number is 31 at the

10   bottom which has the PTSD and anxiety requiring time off of

11   work due to anxiety and flashbacks, lack of concentration.

12           THE COURT:  And what is this document?

13           MR. K. FLAXMAN:  This is the form giving him --

14   approving his request for FMLA leave and describing what he

15   has to do, what notice he has to give, I believe.

16           THE COURT:  Ms. Hasan?

17           MS. HASAN:  Yes.

18           THE COURT:  What's your position?

19           MS. HASAN:  Your Honor, this is the form that

20   approved his FMLA leave for the year 2016.

21           We are not disputing that he had a diagnosis of PTSD.

22   What we dispute is that he informed Ms. Shinnawi that he was

23   seeking leave -- what type of leave and for what condition in

24   his conversation in September 2016.  I suppose we don't have a

25   strong objection to a reference to his diagnosis.  However,

1    the testimony about why he needed it, the doctor is not going

2    to be there to testify.  Those records that are identified as

3    an exhibit by defendant -- or plaintiffs would not be admitted

4    into evidence because there's nobody there to testify

5    regarding those.  They haven't been submitted to the Sheriff's

6    Office.  Nobody at the Sheriff's Office reviewed them or

7    received them.  The cause of the PTSD, as Mr. Flaxman

8    indicated earlier is because of working at the jail, we do

9    believe that that is objectionable as highly prejudicial.

10            THE COURT:  Yeah.  All right.  What this has devolved

11   into is will there be any reference to PTSD whatsoever in the

12   course of the trial.  I think Mr. Flaxman has convinced me

13   that it's impractical to purge any reference to PTSD from the

14   trial.

15            So with respect to the elements instruction, we'll

16   leave the reference to posttraumatic stress disorder.  You can

17   introduce the exhibit which for the record there's been no --

18   there was no objection raised to the inclusion.  In fact,

19   that's included in the agreed exhibits.

20            So Mr. Ziccarelli can, excuse me, refer to the fact

21   that he was diagnosed with PTSD.  That's as far as we go.

22   There's no relevance to what that means for his comprehension

23   of the conversation with Ms. Shinnawi, no relevance to how

24   he -- you know, what the traumatic events that caused the PTSD

25   may be or anything else.  It's simply that he has been

1    diagnosed with PTSD which qualifies as a serious medical issue

2    and that he was advised by his treating -- I don't know.  Is

3    it a physician or psychologist?

4           MR. K. FLAXMAN:  Psychiatrist.

5           THE COURT:  Okay.  By his treating physician

6    that he -- he can testify -- this, again, is not an element of

7    the offense, but he can testify as we've already discussed,

8    that he was told by his psychiatrist that he needed a

9    treatment program for eight weeks.

10          MR. K. FLAXMAN:  We would ask that he be allowed to

11   testify that the PTSD arose from an incident that occurred in

12   the course of his employment without giving the details of it.

13          THE COURT:  It's irrelevant.

14          MR. K. FLAXMAN:  I think it's relevant to his

15   credibility of why he needed to take time off away from work.

16   It was not just to get treatment.  It was not to be at the

17   place that brought back --

18          THE COURT:  The jury is being instructed consistent

19   with the statute that he needs to take time off because he's

20   unable to perform the functions of his job.

21          MR. K. FLAXMAN:  Yeah.  But was that because of an

22   automobile accident that gave him flashbacks of dying in the

23   road, or was it because he got beat up by inmates?

24          THE COURT:  It doesn't matter.  He can't do the job.

25   That's why he needed leave to get treatment.

1      MR. K. FLAXMAN:  I respectfully suggest that it goes

2  to his credibility, but you've heard that argument and I'll

3  stop.

4      THE COURT:  I have heard that.  I disagree with it,

5  and that is overruled.

6      Okay.  Now, Notice.  The changes at the beginning

7  were simply designed to make it more -- I think in this case

8  given it's not a denial case that the language of the pattern

9  instruction was geared to a denial case, and the idea that you

10  have to provide 30 days of notice and then there is the

11  exception language that says, you know, or if, in fact, you

12  don't have to provide 30 days' notice; you have to provide

13  notice as soon as possible and practical.  I think in this

14  case what that means for notice is that Mr. Ziccarelli is

15  required to provide notice of his need for FMLA leave as soon

16  as both possible and practical, or 30 days prior to when the

17  leave was to begin, whichever was later.

18      I think that's an accurate statement, and it puts at

19  the forefront the context of this, case which is

20  Mr. Ziccarelli wasn't -- I don't think anybody maintains was

21  not providing 30 days' notice.  To the extent he was providing

22  notice, which I understand is a disputed issue of, you know,

23  what was covered in that conversation.  But to the extent he

24  was providing notice, he was providing notice that he needed

25  leave now, and he was doing that in the wake of receiving the

1     advice of the doctor as to how long he needed to -- that he

2     needed to go into this treatment program.  So I think from

3     that standpoint, it makes more sense to be talking about

4     notice that is possible and practical taking into account all

5     the facts and circumstances, putting that before the 30-day

6     notice provision.

7            MS. HASAN:  No objection.

8            MR. K. FLAXMAN:  Excuse me for a second.

9      (Counsel conferring.)

10           MR. K. FLAXMAN:  You know, if 30 days is not part of

11    this case, if he either gave notice during this conversation

12    with Ms. Shinnawi or sometime before then, why does the

13    30 days -- why do we have to tell the jury about 30 days other

14    than to -- I don't think there's any reason to do that.  As

15    soon as possible and practical before --

16           THE COURT:  This is not --

17           MR. K. FLAXMAN:  -- is a --

18           MS. HASAN:  I think the 30 days is less important

19    than the part that we are to discuss in that second paragraph.

20    So 30-day notice is the required -- is the requirement of the

21    FMLA, and it's required under the statute.  It's required

22    under the sheriff's policies.  But it is when it's practical.

23    In this case, I don't know what Mr. Ziccarelli 's position is.

24    It sounds like it was not practical for him to give 30-day

25    notice.

1    THE COURT:  Yeah.  All right.  Let's -- I tend to

2  agree that the 30-day notice just -- there's not going to be

3  any factual issue about what transpired, and it's not going to

4  implicate the 30-day question.  I don't understand that the

5  sheriff is going to argue that the plaintiff's claim fails

6  because he didn't provide 30 days' notice as opposed to the

7  sheriff's claim is going to be he didn't provide notice at

8  all.  So from that standpoint, I don't know that 30 days adds

9  anything.

10    But let's talk about another issue here before making

11  any final determinations about this instruction.  The next

12  language, "Ziccarelli must have given at least verbal notice

13  sufficient to make the Sheriff's Office aware that he needed

14  FMLA leave, did not need to mention the FMLA or use any

15  specific words if he gave the Sheriff's Office enough

16  information that the Sheriff's Office knew or should have

17  known that he needed FMLA leave."

18    Do you have any problem with that?

19    MS. HASAN:  No.

20    MR. K. FLAXMAN:  Nor do we, Your Honor.

21    THE COURT:  Okay.  Understanding that, I'm puzzled at

22  what it means to say that "if an employer has customary notice

23  procedures regarding requests for leave, the employer may

24  require the employee to comply with its procedures."

25    We've just told them, and nobody is objecting to that

1   this is not correct, that you have to give at least verbal

2   notice sufficient to make them aware of the need for FMLA

3   leave, but you don't even have to mention FMLA leave as -- or

4   the FMLA as a predicate for the leave request.

5           So it's difficult for me to understand how we could

6   require compliance with notice procedures that the sheriff

7   provides as a predicate for the FMLA claim.

8           MS. HASAN:  Defendants note that this part of the

9   instruction was taken from the comments of this jury

10  instruction in the Seventh Circuit pattern.  This is a

11  standard provision that is allowed in an instruction regarding

12  FMLA claims.  The notice -- Your Honor reviewed Joint

13  Exhibit 4.  That is the notice requirement that somebody is

14  actually seeking FMLA.  What happened in that September phone

15  conversation was an inquiry about FMLA.  That was not notice.

16          THE COURT:  Well, I understand -- you have to bear in

17  mind here, I mean, the facts may bear out and the jury may

18  agree with you about what transpired in this conversation, but

19  I can't assume at this juncture that that's how that will wash

20  out.  There's a dispute about what was said.  The defendants

21  may say -- and this is why I said that, you know, I think the

22  existence of policies are relevant to Ms. Shinnawi's testimony

23  because if there is a policy and procedure in place, that

24  makes it I think more likely that Ms. Shinnawi's account will

25  be credited by the jury.  It's relevant in that regard.

1        But I don't see how we can say it's an element.  It's

2   a requirement for a valid FMLA claim that you comply with an

3   employer's written procedures about how to provide notice of

4   the FMLA claim or the need for FMLA leave when you don't even

5   have to mention the FMLA or use any specific words if you gave

6   the Sheriff's Office enough information that the office knew

7   or should have known that he needed FMLA leave.  That's the

8   law.  So I can't reconcile that law which says you don't even

9   have to mention the FMLA with your proposed instruction that

10  has you have to comply with the employer's policies with

11  regard to notice.

12        MS. HASAN:  Your Honor, we would submit that in order

13  for there to be a proper FMLA request, like this was an

14  inquiry.  It's a different analysis.

15        THE COURT:  That's what's you're going to argue, and

16  you're going to argue that there was no -- you know, he didn't

17  meet the notice requirements at all because he never provided

18  any notice.  Mr. Flaxman is going to argue that based on

19  Mr. Ziccarelli's testimony he told them that he needed FMLA

20  leave of eight weeks because that's what the doctor had told

21  him and that in that conversation he therefore provided notice

22  to the Sheriff's Office that he needed FMLA leave for eight

23  weeks.  The fact that he didn't comply with the written

24  procedures for notice that the Sheriff's Office may have

25  promulgated does not appear to be necessary given the language

1    that everybody has agreed to that he doesn't even have to

2    mention the FMLA.

3           So unless you can explain to me why or reconcile the

4    instruction that you're adding about complying with the

5    sheriff's notice provisions or procedures, unless you can

6    reconcile that with the language that he doesn't have to even

7    refer to the FMLA as long as he gives enough information that

8    the sheriff knew or should have known that he needed FMLA

9    leave, I don't think that that's an appropriate instruction.

10          MS. HASAN:  I think generally speaking you don't have

11   to mention FMLA.  We know that Mr. Ziccarelli did mention

12   FMLA.  Everybody agrees on that.  He did mention that he

13   needed FMLA leave.  However, the Sheriff's Office does have

14   standard policies and procedures for submitting such a

15   request.  And as we talked about last week, the request that

16   is a joint exhibit 4 is contemplating intermittent FMLA leave

17   for a variety of conditions, and this request was a different

18   type of leave.  It was for block FMLA leave seeking eight

19   weeks.  And so he would be required to submit a separate

20   request that would need to be evaluated and approved.

21          THE COURT:  Okay.  Again, I understand that the

22   Sheriff's Office position is that there was not notice

23   provided in compliance with the sheriff's procedures, but I

24   don't think that that requirement for liability under the FMLA

25   is consistent with the law under the FMLA that says adequate

1    notice is notice that the Sheriff's Office knew or should have

2    known that Ziccarelli needed FMLA leave.  Those two things

3    can't be reconciled.

4          So I'm not going to give the statement that "if an

5    employer has customary notice procedures regarding requests

6    for leave, the employer may require the employee to comply

7    with its procedures."  That's out.

8          All right.  And then the element 4, discouragement

9    and interference.

10          MR. J. FLAXMAN:  Your Honor, earlier in that notice

11   instruction, we had talked about the 30 days.

12          THE COURT:  Oh, right.  Thank you.  Yeah.  We'll take

13   that out as well.  Okay.

14          All right.  Discouragement and interference.

15   Essentially the last sentence there is struck.  I think it's

16   gilding the lily after the sentence that precedes it:  "This

17   test uses an objective standard based on how a reasonable

18   employee might react, not Mr. Ziccarelli's subjective

19   feelings," period.  I don't think we need to go on with "An

20   employee who is particularly sensitive to an employer's

21   slights receives no greater protection than one who is able to

22   shrug them off."  Again, I think the point is made in the

23   preceding sentence.

24          MR. K. FLAXMAN:  The second line refers to the

25   sheriff's actions which it gets confusing again with the

 1   different way we're referring to the sheriff, or the office of

 2   the sheriff.

 3          MS. HASAN:  I can speak to this.  We conferred when

 4   Your Honor took a break earlier.  We agreed to make all

 5   references to the Sheriff's Office as opposed to Tom Dart or

 6   to Sheriff Dart.

 7          THE COURT:  Okay.

 8          MS. HASAN:  So --

 9          THE COURT:  Or official capacity or anything like

10   that?

11          MS. HASAN:  Yeah.  Yes.  So the Cook County Sheriff's

12   Office is appropriate, or the Sheriff's Office.

13          THE COURT:  Okay.  Good.

14          All right.  And then the second paragraph there,

15   again, was just unnecessary in light of the inclusion of the

16   "if you find" paragraphs in the elements instruction.

17          Okay.  Damages, page 12.  So here's where I am and

18   what informed my edits here.  The damages claimed have to be

19   direct.  That's really the statutory requirement.  I have, you

20   know, as we discussed, difficulty reconciling the

21   Seventh Circuit's discussion of the snowballing consequences

22   with its statements that the evidence falls far short of

23   establishing a constructive discharge and the rejection of

24   constructive discharge theory with respect to the retaliation

25   claim.  But clearly the Seventh Circuit thought that there was

1    something that could potentially warrant the Court's

2    consideration or the possibility that there was some damage

3    beyond recovery of accrued sick leave benefits.

4            So what I'm going to do is I'm going to -- well, I'm

5    going to propose to add the language that any loss of wages

6    and benefits that was directly caused by the sheriff's -- by

7    the Sheriff's Office -- if you find that Mr. Ziccarelli --

8    sorry.  I got too many edits here.

9            "If you find that Mr. Ziccarelli has proved his claim

10    by a preponderance of the evidence, you should award him" --

11    "you should award him" I guess "as damages" should stay in --

12    "you should award him as damages any loss of wages and

13    benefits that was directly caused by the Sheriff's Office" --

14    "by the Sheriff's Office's interference with his ability to

15    take FMLA leave.  It is Mr. Ziccarelli's burden to prove by a

16    preponderance of the evidence that he lost wages and benefits

17    and the amount of his loss.  If you find that plaintiff has

18    not proved that he is entitled to compensation for lost wages

19    and benefits" -- "or benefits, then you should return a

20    verdict in favor of plaintiff and against defendant on the

21    $1."  Put that to the side.  We'll talk about that in a

22    moment.

23            So my view is it's appropriate to instruct the jury

24    that damages have to be directly caused by the Sheriff's

25    Office interference.  That's Mr. Ziccarelli's burden to prove

1 by a preponderance of the evidence.

2          Depending on the evidence at trial, it is possible

3 that the Court would -- put it this way:  I share the

4 Seventh Circuit's skepticism that Mr. Ziccarelli's damages

5 could include, you know, constructive discharge or whatever

6 comes after that in terms of his inability to -- the loss of

7 his job.  I don't use that as a term of art.  I don't think

8 that -- I don't expect that there's going to be testimony that

9 suggests that damages relating -- stemming from or arising in

10 connection with or caused by his resignation will be

11 appropriately considered to be direct damages.  But I'm going

12 to let the question I believe go to the jury, and we will see

13 what the jury does with it, understanding that the Court then

14 has the option, if I feel that the damage award is

15 unjustified, to entertain a Rule 50 motion or remitter motion

16 with respect to damages.  So that's where I am at this point.

17          MS. ORI:  Judge.

18          THE COURT:  Go ahead.

19          MS. ORI:  When we were here last week, our motion *in*

20 *limine* No. 1 about -- I want to understand the parameters of

21 what testimony plaintiff can testify to about what his damages

22 are.  I know he submitted his lost -- the Exhibit 2, I think

23 this Plaintiff's Exhibit 2, proposed exhibit, summary of lost

24 wages.  I mean, is that what he's intending to testify to?

25 Because it's highly speculative.  He's seeking seven years of

1    back pay.  He has no pension -- testimony about what his

2    pension would be.  It's all very speculative, and obviously I

3    don't want that to come into evidence.

4            THE COURT:  Well, I don't have the document in front

5    of me here.  Bear with me.

6            Jackie, where is that document?

7            LAW CLERK:  It's in the case folder, the main folder,

8    lost wages, PX 2.  I also just e-mailed it to you.  It's the

9    second document under the folders.

10           THE COURT:  All right.  What I'm looking at,

11   plaintiff's summary of lost wages, running from 2016, part, to

12   2023.  Is that what you're referring to, Ms. Ori?

13           MS. ORI:  Yes.

14           THE COURT:  Well, just as an initial question, I

15   don't see any reference to pension benefits.

16           MS. ORI:  I guess to be clear, so my motion *in*

17   *limine* -- at his deposition, at his second deposition after

18   discovery was reopened, he said he was seeking three years of

19   back pay, pension, and reinstatement.  And so this Exhibit 2

20   came out after -- you know, it came out during -- it was

21   created by plaintiff.  You know, Mr. Ziccarelli retired full

22   stop.  Any damages, any sort of lost wages he -- after he

23   retired should not be compensable.  I would say perhaps if

24   there was a time period between the conversation with

25   Ms. Shinnawi and when he retired, that would be the direct --

1    he retired.

2         THE COURT:  Right.  That's your argument.  The

3    plaintiff's argument is that he was justified in quitting

4    based on the conversation that he had with Ms. Shinnawi.  If

5    one credits that view of the conversation, then that doesn't

6    conceptually take these damages out of the question.

7         It would seem to me -- and I'm not making any

8    definitive ruling because we don't have the fully developed

9    factual record of what this conversation consisted of, which

10   is why I'm leaving open the possibility to a Rule 50 motion

11   with respect to damages.  But given the Seventh Circuit's

12   unwillingness to -- and I don't mean that pejoratively, but

13   they obviously didn't think it was appropriate to say as a

14   matter of law that there was no set of facts that -- under

15   which Mr. Ziccarelli might be entitled to damages, you know,

16   based on a constructive discharge theory.  And on that basis,

17   I think it's appropriate to include the jury instruction that

18   would tell the jury that lost wages and benefits that were

19   directly caused by the Sheriff's Office interference are fair

20   game.  Now, again, that's dependent on how the evidence comes

21   out at trial about this conversation, whatever other evidence

22   there might be that could bear on the question.

23        And so whatever the procedural format, Rule 50

24   motion, motion for remitter, whatever, those are options

25   available to the Court if I think that the factual record that

1    is developed at trial simply does not support as a matter of

2    law damages arising from Mr. Ziccarelli's choice to terminate

3    his employment with the Sheriff's Office.

4           So that's -- I mean, I'm more than happy to discuss

5    it, take into account anybody else's further thoughts about

6    it; but I have given this a lot of thought, and that's the

7    best I can come up with in terms of how to handle it at this

8    point.  Again, I share the Seventh Circuit's skepticism that

9    in light -- again, particularly in light of the affirmance of

10    summary judgment as to Mr. Ziccarelli's retaliation

11    constructive discharge claim, the discussion of that in the

12    interference claim, the skepticism about it that is referenced

13    in the discussion in the interference claim portion of the

14    opinion.  But despite all that, the Seventh Circuit said,

15    District court, you need to consider all of this on a more

16    fully developed record.  So that's what I think I got to do.

17           MS. ORI:  Well, I think Exhibit 2 is -- there would

18    be no foundation for this document, and it's highly

19    speculative that he would work for another seven years after

20    this conversation.

21           THE COURT:  Well, you're going to be able to

22    cross-examine him about that.

23           MS. ORI:  Okay.  I would object to this exhibit

24    though.  I mean, how --

25           THE COURT:  Well, with respect to the exhibit, he's

1    competent to testify about his wages, what his wages were.

2              It's not clear to me -- Mr. Flaxman, how are you

3    arriving at the total wages and bonus figures that are

4    reflected there?

5              MR. K. FLAXMAN:  The wages are set out in the

6    collective bargaining agreement which we've identified as

7    exhibits.  And he'll be asked if you had -- if you had been

8    working in 2017, what would your salary have been and what

9    would your bonus have been, in 2018, based on the page in the

10   collective bargaining agreement which identified or set out

11   what his salary would have been.

12             THE COURT:  So the bonus figures there are

13   nondiscretionary?

14             MR. K. FLAXMAN:  That's right.  They have a good

15   union.

16             THE COURT:  And the cost of living escalator, is that

17   also a term of the CBA?

18             MR. K. FLAXMAN:  That's correct.  And I omitted

19   interest in doing this because perhaps he wouldn't be

20   competent to testify about that, and we don't have an

21   economist to talk about that.  But I think we would be

22   satisfied with the total wages and bonus if the jury awarded

23   that.

24             THE COURT:  I'm sure you would.  All right.  So I

25   think this is not problematic from that standpoint.  So there

1    won't be -- there's not going to be testimony about pension

2    benefits or other damages that are not included on this

3    summary.  Okay.

4         Nominal Damages.  I am inclined not to give that

5    instruction because I have yet to find -- despite significant

6    research, we've not found a single case that awards nominal

7    damages or instructs the jury about nominal damages in an FMLA

8    interference case.  Yes, there are a few cases that recognize

9    the ability to get a declaratory judgment in an FMLA case, but

10   that would be a component and associated with the provision of

11   equitable relief which isn't a jury matter.  So from that

12   standpoint, I don't see any basis to believe that nominal

13   damages would be permitted in an FMLA interference case.  So I

14   am not inclined to give the nominal damage instruction.

15        Any argument?

16        MR. K. FLAXMAN:  Not from plaintiff, Your Honor.

17        MS. HASAN:  No.

18        THE COURT:  All right.  If not from plaintiff, then

19   I'm assuming no objection by the defendants.

20        All right.  Page 14, Jury Deliberations, this is

21   pretty standard stuff.

22        MR. K. FLAXMAN:  Did we skip mitigation of damages?

23        THE COURT:  Oh, yes, I did.  I'm sorry.  Mitigation

24   of Damages, minor edits I don't think changed the substance.

25        Any objections?

1     MS. HASAN:  No objections, Your Honor.  We may not

2     need this instruction depending on what evidence comes in.

3          MR. K. FLAXMAN:  Well, Judge, if this -- unless

4     they're waiving that affirmative defense before trial,

5     Mr. Ziccarelli is going to talk about his life after he

6     resigned, and all of the stuff that defendants have worked so

7     hard to keep out is going to come in about his attempts to

8     get -- able to work again.  And if they don't want to have --

9          THE COURT:  We did talk about that on the 28th and

10    the risk that a mitigation of damages issue does bring

11    relevance to Mr. Ziccarelli's activities post-termination, or

12    post-resignation, whatever we're going to call it.

13         MS. HASAN:  In light of Your Honor's ruling about

14    damages perhaps being compensable for lost wages, then this

15    mitigation testimony would be relevant.

16         THE COURT:  Well, I'm not saying it's not relevant.

17    I'm just saying it's --

18         MS. HASAN:  I don't know if it will come in.  Yeah.

19         THE COURT:  It's going to make other evidence

20    potentially relevant.  So unless you're willing to forswear

21    evidence of mitigation, failure to mitigate damages, when

22    Mr. Flaxman calls his client to testify, what he was doing

23    after he left the Sheriff's Office, you know, I'm not saying

24    everything he was doing would be relevant, but things that

25    bear on his ability to find another job would be relevant.

1    MS. HASAN:  I think we'll waive our affirmative

2 defense.

3    THE COURT:  Okay.  Then the defendant has waived the

4 affirmative defense, so post-termination conduct is not going

5 to be relevant.

6    MS. ORI:  If we could just have one moment.

7    THE COURT:  All right.

8    (Counsel conferring.)

9    MR. K. FLAXMAN:  Has Your Honor done a form of

10 verdict?

11    THE COURT:  No, didn't get to that.

12    MR. K. FLAXMAN:  All right.

13    THE COURT:  We'll get that to you on Monday.

14    MR. J. FLAXMAN:  What time do you expect to have the

15 questionnaires on Monday?

16    THE COURT:  10:00ish.

17    MR. J. FLAXMAN:  Okay.

18    MR. K. FLAXMAN:  And you want us here at --

19    THE COURT:  9:00.

20    MR. K. FLAXMAN:  -- 7:00 Monday?

21    THE COURT:  9:00.  Just in case we have things to

22 talk about.

23    MS. HASAN:  Sorry.  We just wanted to confer about

24 this issue of mitigation.

25    With regard to -- if we could just ask for the

1  Court's clarification on the issue.  So if we waive our

2  mitigation defense, then are we disallowing Mr. Ziccarelli's

3  testimony regarding his mitigation efforts?

4          THE COURT:  Yes, there wouldn't be any relevance to

5  post-termination conduct.

6          MS. HASAN:  Okay.  Then we do waive our defense.

7          THE COURT:  Okay.  All right.  Moving on page 14,

8  Jury Deliberations, any issues there?  I take unwarranted

9  pride in the fact I've updated this to refer to X rather than

10 Twitter and to include Threads in the list.

11         MR. K. FLAXMAN:  There's no reference to MySpace.

12         THE COURT:  Anybody have anything on page 14?

13         MS. HASAN:  No.

14         THE COURT:  All right.  Carrying over to page 15.  I

15 have bolded and italicized the "don't tell me the breakdown of

16 any votes."  Notwithstanding that fact, most jurors -- juries

17 often provide that so hoping to prevent that.

18         While you were conferring, Mr. Flaxman asked about

19 the verdict form.  We didn't get to that so we'll get that to

20 you on Monday to review.

21         Anything on 15 and 16 under the heading of the

22 verdict form instructions?

23         MR. J. FLAXMAN:  One thing about this is that it

24 mentioned that the exhibits are going to be available to them

25 electronically.

1          THE COURT:  Ah.  Good question.  That's on my list of

2     things to talk about.

3          Normally I require the plaintiff to supply a laptop

4     that has nothing on it other than the exhibits, and that's

5     what would go back to the jury room.  I'm not sure we need to

6     do that.  I'm not sure that you guys are prepared to cough up

7     a laptop that could be, you know, devoid of anything other

8     than that.  We don't have many exhibits that are going to be

9     introduced, I believe; is that fair?

10          MR. K. FLAXMAN:  Yes.

11          THE COURT:  You disagree?

12          MS. HASAN:  No, we agree.

13          THE COURT:  All right.  Then I think what we will do

14     in this case is make the exhibits available in hard copy to

15     the defendant.  So make sure, whether it's Tuesday or

16     Wednesday, you've got copies, clean copies marked with the

17     exhibit numbers for anything that you've introduced in your

18     cases.  And we'll get that together once the jury goes out to

19     deliberate and get those hard copies to them.

20          MR. K. FLAXMAN:  Hypothetical question.  If we finish

21     at 3:00 on Tuesday, would we come back Wednesday morning for a

22     fresh start for closing and instructions or would we press on?

23          THE COURT:  If we finish the evidence, you know, at

24     3:00 or later, we'll come back and close first thing on

25     Wednesday morning.  If it's -- if we finish the evidence at

```
1    noon on Tuesday, be prepared to close on Tuesday.  This is not

2    going to take a long time, I presume --

3              MR. K. FLAXMAN:  Thank you.

4              THE COURT:  -- so we'll see where we are after

5    Monday.  But I do expect that we'll start presenting evidence

6    on Monday.  So have your client ready.  Is anybody other than

7    Mr. Ziccarelli going to be called now?  Oh, you said you're

8    going to call Ms. Shinnawi in your case?

9              MR. K. FLAXMAN:  Right, as our first witness.

10             THE COURT:  Okay.  All right.

11             MS. ORI:  Can we revisit the mitigation of damages

12   instruction?  I just want to make sure I understand what the

13   parameters are.  Just because we're not -- just because we

14   will waive this affirmative defense, I think it is relevant

15   that Mr. Ziccarelli was unable to return to any type of work

16   for three years.  I think that to me shows that FMLA was not

17   applicable because it only provides 12 weeks of protected

18   leave.

19             THE COURT:  Well, you can certainly cross-examine

20   Mr. Ziccarelli about his -- to the effect that he -- what did

21   he say in his deposition?

22             MS. ORI:  He said that he was -- I can find the exact

23   language, but something to the effect of his psychological

24   condition prevented him from returning to find a job for three

25   years.  I can get the -- sorry.  It's on page 65, I believe.
```

1          "Am I correct that it took you several years to be in

2    a psychological condition where you could go back to work?"

3          And he said:  "Yes."

4          So I think that's relevant to show, you know, all

5    these arguments that the defense has, but even if he -- even

6    if he had been discouraged from taking FMLA, he still does not

7    show prejudice because he could not return to work in the

8    remaining FMLA time he had.

9          THE COURT:  Well, that's, again, your argument, and

10   that's a fair argument.  The defense -- or the plaintiff has a

11   different argument, saying he was justified on the basis of

12   that conversation to, you know, resign and, you know, had that

13   conversation not taken place, he would have, you know,

14   obtained the treatment and been able to come back to work

15   sooner.  That's all fair argument.

16         What you can't stray into is -- well, I'll leave it

17   at that.  We've got competing versions of what would have

18   happened so it's open to the plaintiff to say -- well, it's

19   open to the plaintiff to make the argument of what would have

20   happened had the sheriff not interfered with his FMLA leave.

21   It's open to you to respond to what he says in that regard.

22         MS. ORI:  Okay.  So that line of questioning, it's

23   fair game even if we're not bringing a mitigation affirmative

24   defense.

25         THE COURT:  Yeah.  If Mr. Ziccarelli testifies that

1    he would have --

2            MR. K. FLAXMAN:  If I may, this is something that

3    could be taken up after Mr. Ziccarelli's testimony at a

4    sidebar.

5            THE COURT:  Well, no, not necessarily because you

6    may -- we need to be clear if you've already gone down a path

7    that you wouldn't be able to go down.

8            So Mr. Ziccarelli can argue -- make his argument

9    about what would have happened had the sheriff not unlawfully

10   interfered with his FMLA right.  You can cross-examine him as

11   to the fact that he -- it's acknowledged that he was not able

12   to return to work for three years.  Anything beyond that

13   exchange would have to be fronted.

14           MS. ORI:  Okay.

15           THE COURT:  Okay.

16           All right.  We talked about the exhibits.

17           All right.  That's it for my agenda.  Anybody have

18   questions, logistical or otherwise, in terms of how we're

19   going to proceed?

20           MR. J. FLAXMAN:  Does the Court have instructions at

21   the start of the case, or is it just what's on the jury

22   questionnaire?

23           THE COURT:  Preliminary instructions, again, just

24   taking some of the general instructions.

25           MR. J. FLAXMAN:  Okay.

1        MR. K. FLAXMAN:  Do you allow jurors to ask

2   questions?

3        THE COURT:  No.  I did once offer that opportunity.

4   I had no takers, and I have not tried it again.  One of these

5   days I might, but not this trial.

6        All right.  If nothing else, be here at 9:00 Monday

7   morning.  Again, we'll have -- we'll get you the

8   questionnaires as quickly as we can and then we'll get

9   started.  All right.

10        MR. J. FLAXMAN:  Can we try using the electronic

11   exhibit system right now after we --

12        THE COURT:  Yeah, let me -- I have to turn it on

13   here.

14        MR. K. FLAXMAN:  You could do it from the table.

15        THE COURT:  You could do it from the table or the

16   podium.

17        Are you on, Mr. Flaxman?

18        MR. J. FLAXMAN:  Yes.

19        MR. K. FLAXMAN:  It's not on the screen.

20        MS. HASAN:  That's on the other side.

21        THE COURT:  Well, actually I've got the defense table

22   selected.  Your computer is on now.

23        MR. J. FLAXMAN:  It is connected at plaintiff table.

24        THE COURT:  There's two connections.

25        MS. HASAN:  Your Honor, a question about the

1  exhibits.  So would we prepare eight copies of the exhibits

2  for each of the eight jurors or just one binder?  What's your

3  preference?

4  　　　　　THE COURT:  I think one copy is enough.

5  　　　　　MS. HASAN:  Okay.

6  　　　　　MR. J. FLAXMAN:  Well, we'll bring another laptop on

7  Monday and get it to work.

8  　　　　　MS. HASAN:  Something's flashed.

9  　　　　　MR. K. FLAXMAN:  Did you try the podium?

10  　　　　　THE COURT:  Oh, wait a minute.

11  　　　　　MR. K. FLAXMAN:  There we are.

12  　　　　　THE COURT:  There you go.  I got my prosecution and

13  defense mixed up because this is a civil case.

14  　　　　　All right.  So that's your computer?

15  　　　　　MR. J. FLAXMAN:  Yeah, it's working.

16  　　　　　MS. ORI:  Is it the same up there as well, you would

17  just --

18  　　　　　THE COURT:  Yeah, just connect into the lectern HDMI.

19  　　　　　MS. ORI:  I want to try mine as well.

20  　　　　　THE COURT:  Okay.

21  　　　　　MS. ORI:  Is there one over here or does it share

22  just one cord?

23  　　　　　THE COURT:  No, there's two.

24  　　　　　MS. ORI:  I don't see the other cord.

25  　　　　　THE COURT:  There's supposed to be two.  Put it that

1    way.

2            MS. HASAN:  At each station?

3            MS. ORI:  This is the one you were using?

4            MS. HASAN:  No, I was using HDMI cable.

5            MS. ORI:  Sorry.  Can I just play an audio file just

6    to see if the sound works?

7            THE COURT:  Yes.

8        (Video played in open court.)

9            MS. ORI:  It sounded good.  Thank you.

10           MR. J. FLAXMAN:  So Andy will be with us.

11           MS. ORI:  Pardon me?

12           MR. J. FLAXMAN:  Andy will be with us.

13           MS. ORI:  Andy who has passed away, yes, the attorney

14   who handled this case.

15           MR. J. FLAXMAN:  I didn't know he passed away.

16           MS. ORI:  Right before COVID, actually.

17           THE COURT:  All right.  Okay.  So we're all checked

18   out?

19           MR. K. FLAXMAN:  Yes.  Thank you, Your Honor.

20           THE COURT:  Okay.  Have a good weekend.  We'll see

21   you on Monday.

22           MR. K. FLAXMAN:  Thank you, Your Honor.  And a good

23   weekend to you too.

24      (Which were all the proceedings heard.)

25

1                            CERTIFICATE

2      I certify that the foregoing is a correct transcript from

3  the record of proceedings in the above-entitled matter.

4  */s/Kelly M. Fitzgerald*              *March 28, 2024*
   _____        _____
5  Kelly M. Fitzgerald                  Date
   Official Court Reporter
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25